UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
GARY R. BROWN and "JANE" BROWN,

                    Plaintiffs,                                    Civil Action No.

                                                    JURY TRIAL DEMANDED

        -against-

ALLSTATE INDEMNITY COMPANY and
TEMPORARY HOUSING, INC. d/b/a
CRS TEMPORARY HOUSING

                    Defendants.
------------------------------------------------------------------------x

Plaintiffs Gary R. Brown[1]  and "Jane" Brown,[2] by their attorneys, Farrell Fritz P.C., as and for their Complaint, allege as follows:

## NATURE OF THE ACTION

1.      On April 22, 2019, the home of plaintiffs Gary Brown and "Jane" Brown was engulfed suddenly in a catastrophic fire that destroyed the home and virtually all of the Browns' possessions.  As loyal customers of Allstate for more than thirty years, the Browns were comforted by the notion that they would be able to rely on their insurer, the "Good Hands" people, in their time of crisis.  The Browns would soon learn this reliance was misplaced.

2.      Allstate, for almost six months, conducted a dilatory investigation of the Browns' structural loss claim, insisting the home was repairable before acknowledging it was not, needlessly delaying the commencement of demolition and reconstruction.  Allstate incurred tens of thousands of dollars of so-called "remediation costs" in an effort to support this assertion,

---

[1] To ensure proper judicial assignment of the action, plaintiffs note plaintiff Gary R. Brown is a United States District Judge for the Eastern District of New York sitting in the Alfonse D'Amato United States Courthouse in Central Islip, New York.

[2] Because of Judge Brown's position as a District Judge, presiding over criminal matters, the given name of his wife, plaintiff "Jane" Brown, is identified pseudonymously, while the properties at issue are identified generally.  The true given name of "Jane" Brown and the specific property addresses, known to Defendants, will be identified in a separate sealed submission.

costs that were charged to the Brown yet incurred only to advance's Allstate's economic interest in avoiding a determination that the house could not be restored.

3.      Allstate, after initially agreeing to enlarge the cap on "Additional Living Expenses" due to Allstate's delays in investigating, adjusting, and paying the Browns' structural loss claim, later withdrew its commitment to enlarge the cap.  Instead, Allstate and its agent, CRS, has taken steps to try to evict the Brown family from their temporary rental home during the height of the COVID-19 pandemic, attempting to end-run governmental prohibitions designed to protect citizens during the public health emergency.

4.      Allstate asserts it is "working to keep our customers and communities safe and healthy as we change our routines to slow the spread of COVID-19," and is "committed to making sure you have the support you need during these challenging times."  But, by attempting to coerce the Browns to vacate their rental home in the middle of the COVID-19 pandemic, Allstate and CRS have cavalierly placed the Browns' health and safety in jeopardy, ignored Allstate's own commitment to enlarge the time for the Browns to remain at the rental home, and ignored the existing moratorium on evictions in New York State.

5.      This action seeks to recover damages for Allstate's unreasonable delay in investigating, adjusting, and paying the Browns' structural loss claim, Allstate's refusal to honor its commitment to reimburse the Browns for additional living expenses caused by Allstate's delay, Allstate's wrongful deduction of costs that served only to advance's Allstate's economic interests, and the wrongful actions of Allstate and CRS in seeking to evict the Browns from their temporary rental home.

## JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction over the matter pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 4072 because it is where plaintiffs' reside, where their property is located, and where a substantial part of the events at issue took place.

## PARTIES

8.      Plaintiff Gary R. Brown is a natural person and a citizen of the State of New York.

9.      Plaintiff "Jane" Brown is a natural person, a citizen of the State of New York, and the spouse of plaintiff Gary R. Brown

10.      Plaintiffs Gary R. Brown and "Jane" Brown (collectively, the "Browns") are residents of the County of Suffolk, State of New York.

11.      Defendant Allstate Indemnity Company ("Allstate") is, upon information and belief, a subsidiary of Allstate Insurance Company that is registered in Delaware and has a principal place of business in Northbrook, Illinois.

12.      Defendant Temporary Housing, Inc, d/b/a CRS Temporary Housing ("CRS") is, upon information and belief, an Arizona corporation with its principal place of business in Phoenix, Arizona.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

13.     The Browns have been customers of Allstate for more than thirty years, receiving from Allstate insurance coverage for their home and automobiles in exchange for premiums totaling hundreds of thousands of dollars.

14.     At all times since 2002, the Browns have owned a single-family residence ("Home") in the Town of Brookhaven, Suffolk County, New York, consisting of a two-story structure with a partially finished basement and an adjoining garage.

15.     The Home is the Browns' only residence.

16.     On April 22, 2019, the Home was covered and insured by Renewal Deluxe Homeowners Policy 903 266 702 ("Policy") issued by Allstate for the period July 1, 2018 through July 1, 2019.

**The Browns' Home is Destroyed by Fire**

17.     On April 22, 2019, the Home was engulfed by a fire ("Fire") due to a sudden electrical surge believed to have been caused by the negligence of Public Service Enterprise Group-Long Island ("PSEGLI"), the local power company, in maintaining its electricity distribution system.

18.     The Fire was reported immediately to Allstate.

19.     On April 24, 2019, structural and contents adjustors from Allstate inspected the Home.

20.     Allstate notified the Browns both orally and in written communications dated May 3, 2019, May 9, 2019, and May 14, 2019, that the site of the Home could not be disturbed due to Allstate's need to preserve evidence for inspections by "Cause and Origin" experts hired by Allstate and PSEGLI.

21.    Allstate told the Browns the site preservation was necessary to protect Allstate's interest in pursuing a potential subrogation claim against PSEGLI for the Fire.

22.    The Browns complied fully with Allstate's demand to preserve the site of the Home and, on multiple occasions, made the site available for inspection by representatives of Allstate and PSEGLI.

**Allstate Unreasonably Delays Providing**
**a Copy of the Policy to the Browns**

23.    After the Fire, the Browns repeatedly sought a copy of the Policy from Allstate because any Policy documents the Browns did have were destroyed in the Fire.

24.    Immediately after the Fire, the Browns asked their Allstate agent for a copy of the Policy to understand the terms and conditions of their insurance coverage, but the agent told the Browns she had access only to the declarations page and did not have access to the full Policy.

25.    The Browns then sought to obtain a copy of the Policy from Allstate.

26.    On July 7, 2019, after several oral requests went unanswered, the Browns made a written demand on Allstate structural adjuster Denis Halloran ("Halloran") for a copy of the Policy.

27.    On July 15, 2019, not having received a copy of the Policy, the Browns made a written demand on Allstate claims adjuster Celia Granda ("Granda") for a copy of the Policy, noting that Allstate's failure to provide a copy of the Policy was "causing unfair delay and prejudice."

28.    On July 19, 2019, the Browns filed a complaint with the New York State Department of Financial Services regarding Allstate's failure to provide the Browns a copy of the Policy.

29.     On July 22, 2019, three months after the date of the Fire, and three days after the Browns filed their complaint with the New York State Department of Financial Services, Allstate gave the Browns a copy of the Policy.

**Allstate Unreasonably Delays Investigating,
Adjusting, and Paying the Structural Loss Claim**

30.     On or about April 24, 2019, Halloran inspected the site and asserted all walls, floors, ceilings and contents of the Home had to be demolished and removed before Allstate could provide a damage estimate.

31.     No further action was taken on the structural damage claim until June 7, 2019, when Halloran again inspected the site of the Home.

32.     On June 10, 2019, the Browns gave Allstate a written report ("Expert Report") from a structural engineer, obtained by the Browns at considerable expense, who concluded the Home was unsafe and unsalvageable.

33.     In response to the Expert Report, Allstate asked, and the Browns agreed, to make the site of the Home available for inspection by a structural engineering expert retained by Allstate.

34.     On June 13, 2019, Mr. Brown met with Sarah Byer, the engineer retained by Allstate, at the site of the Home, making the Home available for inspection.

35.     During the course of this inspection, in response to a question posed by Mr. Brown about reconstruction costs, Ms. Byer told Mr. Brown that her expertise was limited to structural engineering issues and that she had "no insight" into repair costs, adding that she was from upstate New York and was particularly unfamiliar with repair costs in the New York City and Long Island areas.

36.     On June 21, 2019, Ms. Byer prepared a "Fire Damage Assessment Report," which concluded the Home "is reparable and should not be considered a total loss."

37.     The Fire Damage Assessment Report, prepared after discussions with, and at the direction of, Allstate structural adjustor Halloran, was the product of a person who expressly acknowledged she had "no insight" into repair costs, and the Fire Damage Inspection Report did not document any experience by Ms. Byer supporting an ability to opine on repair costs.

38.     The Fire Damage Assessment Report contains misstatements and misrepresentations about the condition of the Home and the extent of the damage caused by the Fire.

39.     The Fire Damage Assessment Report, for example, states "[n]o fire damage was observed" in the roof framing and selectively includes photographs purporting to substantiate this observation, even though Ms. Byer took dozens of photos of the Home, which would show the Home sustained substantial damage to the roof framing as a result of the Fire.

40.     On June 21, 2019, Allstate declared the Home repairable, using the unsupported conclusions in the Fire Damage Assessment Report to justify this conclusion.

41.     On June 27, 2019, the Town of Brookhaven ("Town"), following its own inspection, issued a notice condemning the Home, finding the "building is dangerous and unsafe, it poses a threat to the health & safety of the area" while noting widespread asbestos contamination.

42.     Notwithstanding both the Expert Report and Town's condemnation, Allstate falsely asserted, to its financial benefit, that the Home could be repaired rather than razed and replaced.

43.     On or about July 14, 2019, Halloran told Mr. Brown, in a telephone conversation memorialized thereafter in writing, that Allstate's repair estimate and payment offer would follow in approximately two weeks.

44.     On or about July 16, 2019, Allstate, through Halloran, gave Mr. Brown an oral structural loss estimate, stating Allstate's offer of payment had to await the completion of Halloran's repair estimate and promising a settlement offer would be made by July 31, 2019.

45.     On July 31, 2019, with no offer of payment having been provided, Allstate stated it would provide its offer of payment by August 2, 2019.

46.     On August 2, 2019, with no offer of payment having been being provided, Allstate stated it would provide its offer of payment sometime in the following week.

47.     On August 5, 2019, the Browns filed a complaint with the New York Department of Financial Services concerning Allstate's delay in providing an offer to adjust and settle the Browns' structural fire loss claim, which included a request that "the 12-month limitation on reimbursement of living expenses under Policy Endorsement AP4729 should be extended due to Allstate's delay in issuing an offer of payment for the losses."

48.     On August 6, 2019, Halloran sent an email ("August 6 Email") to the Browns, attaching an incomplete draft repair estimate and acknowledging that the draft repair estimate did not include a number of necessary items, including, for example, exterior siding.

49.     In the August 6 Email, Halloran stated: "I estimate that with these additions, we will be approaching the policy limits."

50.     In the August 6 Email, Halloran acknowledged Allstate's unacceptable and unreasonable delays in the adjusting process and offered an apology to the Browns, stating:

> I understand you and your family have been under great stress these past few months and these kinds of events are not easy to go through.  I

appreciate your patience during the process and apologize for any
additional stress I may have caused you with the estimating process.

51.     Despite Allstate's acknowledgment that the adjustment process had taken far too
long and that its "repair" estimate was "approaching the policy limits," Allstate would take
nearly two more months to conclude its adjustment process and pay the Browns' structural fire
loss claim.

52.     On August 13, 2019, Allstate provided the Browns with Allstate's first estimate
for what it contended would be a repair of the Home ("August 12 Report").

53.     On August 14, 2019, the Browns sent an email to Allstate with detailed questions
about the August 12 Report, which was unclear in many respects.

54.     On September 14, 2019, following a telephone call with Halloran on September
13, 2019, the Browns wrote to Allstate to identify nine material errors or omissions in the August
12 Report, virtually all of which were acknowledged thereafter by Allstate.

55.     On September 17, 2019, the Browns provided Halloran with a proposed scope of
work from a modular house builder for a potential replacement of the Home.

56.     The Browns' efforts to contact Halloran during the balance of September, 2019
were unsuccessful, learning from an outgoing voice mail message that, from September 16, 2019
through September 30, 2019, Halloran was "away from the office."

57.     On October 1, 2019, Halloran sent an email to the Browns stating Allstate was
prepared to make its first payment for the Browns' structural loss claim.

58.     Remarkably, despite months of needless delay and tens of thousands of dollars in
unnecessary costs, that payment, according to Halloran, would be for an amount at the limit of
the Policy.

59.     On October 2, 2019, five and one-half months after the Fire, Allstate made its first payment in connection with the structural loss claim at, essentially, the Policy limit.

60.     The payment of the structural loss claim almost six months after the Fire at essentially the Policy limit was a recognition that the Home could not be repaired, as Allstate had repeatedly insisted.

61.     Allstate's unreasonable insistence and abandoned position that the Home could be repaired also caused unnecessary interior and exterior investigation expenses, which resulted in an unwarranted reduction in contents coverage.

62.     At Allstate's direction, the Browns retained an Allstate-approved vendor, Clean Sweep, to board up the exterior of the Home immediately after the Fire.

63.     Clean Sweep, at Allstate's direction, was thereafter tasked with clearing the entire interior of the Home, including sheetrock, doors, cabinets, and ceilings, so that Allstate could try to support its ultimately-untenable assertion that the Home could be repaired.

64.     Allstate then deducted these unnecessary costs for interior demolition, in the amount of $33,831.22, from the Browns' contents coverage.

65.     Allstate also, over the Browns' objection, arbitrarily allocated an additional sum of $9,499.58 paid to Clean Sweep to clear the debris from the destroyed contents of the Home, again in an attempt to buttress its ultimately-abandoned position that the Home could be repaired, deducting this amount from the Browns' contents coverage.

66.     Because the contents of the Home were valued far in excess of the contents limit under the Policy, thereby not allowing the Browns to be reimbursed for the full amount of their destroyed possessions, the application of the Clean Sweep charges to the contents portion of the

Browns' fire loss claim, when these charges were incurred for Allstate's benefit, resulted in a loss to the Browns of more than $43,000.

67.     Allstate's investigation in support of a potential subrogation claim against PSEGLI, requiring the site of the Home to remain undisturbed, its ultimately-abandoned position that the Home could be repaired rather than demolished and rebuilt, and its delay in investigating, adjusting, and paying the structural loss claim, caused unreasonable and unnecessary delay.

68.     The Policy provides for payment of Additional Living Expenses ("ALE"), which are "the reasonable increase in living expenses necessary to maintain your normal standard of living when a direct physical loss we cover makes your residence premises uninhabitable."

69.     Had Allstate promptly investigated, adjusted, and paid the structural loss claim, the Browns would have completed the reconstruction of the Home before the spread of the COVID-19 pandemic, which has resulted in a halt to the reconstruction and will cause the Browns to incur at least an additional six months of unnecessary ALE in an amount estimated to exceed $50,000.

**Allstate Retracts its Commitment to Enlarge the Time for Payment
Of Additional Living Expenses Caused by Allstate's Delays in
Investigating, Adjusting, and Paying the Structural Loss Claim**

70.     The Policy states Allstate will pay ALE for the shortest of (a) the time it takes to repair or replace the damaged property, or (b) twelve months.

71.     Given the twelve-month cap in ALE reimbursement, and the time it takes to demolish, clear, and replace a destroyed property, including the time required to apply for and obtain necessary demolition and construction permits, the time required to select and retain design professionals and contractors, and the time required for the construction of a complete

new home, it was critical for Allstate to act expeditiously in investigating, adjusting, and paying the Browns' structural loss claim.

72.     Allstate, upon information and belief, knows that the twelve-month cap on ALE is artificially low, for at least one state (California) requires insurers to provide policies with a minimum of twenty-four months of ALE coverage, while during a recent wildfire incident casualty insurers extended ALE coverage to thirty-six months.

73.     During the unjustifiably-delayed investigation, adjustment, and payment process, the Browns raised repeatedly the question of extending the twelve-month ALE cap due to Allstate's five and one-half month delay in resolving the Browns' structural loss claim, during which time the Browns were prohibited by Allstate from clearing and reconstructing the Home, as that decision would be dependent on Allstate's determination of whether to pay for the demolition of the Home and the construction of a replacement home.

74.     On August 2, 2019, Mr. Brown wrote to Halloran, stating, "As [Allstate adjustor] Granda has reminded me in repeated written correspondence, my additional living expense allowance is purportedly limited to 12 months, and despite numerous requests, I have yet to receive any written assurance from Allstate that this will be extended to account for the delays – none of which are attributable to me."

75.     On August 6, 2019, Halloran responded in writing to Mr. Brown, stating that at the "final inspection" of the Home, scheduled for the following day, "I can answer any questions you have with finalizing the claim and your concerns with ALE."

76.     On August 7, 2019, Mr. Brown and his attorney met Halloran and his manager, Albert Castillo ("Castillo"), at the Home for the "final inspection."

77. During the inspection of the Home on August 7, 2019, Mr. Brown again raised the question of whether Allstate would enlarge the ALE cap of twelve months to address Allstate's delays in investigating, adjusting, and paying the Browns' structural loss claim.

78. During the course of this discussion, Halloran and Castillo stated that while Allstate could not commit to an open-ended extension of the cap, Allstate would extend ALE coverage for at least a three-month period to account for Allstate's delays.

79. The Browns reasonably relied on this representation in their planning, including their dealing with contractors, refraining from investigating alternative sources of housing for the period after the expiration of the twelve-month cap.

80. On January 22, 2020, Granda notified the Browns, in contravention of the commitment and representation made by Halloran and Castillo on August 7, 2019, that Allstate would not extend ALE coverage past April 22, 2020, the one-year anniversary of the Fire.

81. On January 24, 2020, Mr. Brown wrote to Granda, reiterating his request that Allstate honor its commitment, made through Castillo and Halloran, to extend ALE coverage.

82. On January 27, 2020, Granda responded in writing that she "cannot allow [ALE coverage] past July 22nd," indicating she would honor the three-month enlargement promised by Halloran, but then quickly walked back that extension, stating "I do understand that you will need a longer timeframe however there is nothing that I can do to extend you past policy limits."

83. In her January 27, 2020 email, Granda stated neither Halloran, whom she said no longer worked for Allstate, nor his manager, Castillo, were authorized to enlarge ALE coverage, adding that "there is nothing that I can do" to enlarge ALE coverage.

84. On January 31, 2020, Mr. Brown wrote to Courtney V. Welton, Senior Vice President and Chief Ethics Officer of Allstate, describing the sequence of events regarding the

request for an enlargement of ALE coverage and the representations by Allstate employees Halloran and Castillo that Allstate would extend ALE coverage for at least a three-month period to account for Allstate's delays.

85.     An Allstate representative thereafter responded by denying Allstate committed to extend ALE coverage for at least a three-month period to account for Allstate's delays in investigating, adjusting, and paying the Browns' structural loss claim .

**Allstate Acts in Bad Faith in Providing Temporary Housing**

86.     In the weeks following the Fire, the Browns located several potential rental homes similar to the Home, which were consistent with the Policy terms and would accommodate the Browns' need for their child to return to school, yet Allstate unreasonably and without justification refused to approve a one-year lease agreement for temporary housing.

87.     As a result of Allstate's blanket refusal to approve a one-year lease agreement, reflecting its refusal to recognize the extensive damage to the Home and the prolonged period required for reconstruction, the Browns lost several opportunities to obtain rental housing in their neighborhood at a relatively modest cost.

88.     Allstate's recalcitrance forced the Browns to find rental housing accommodating Allstate's demand for a six-month, renewable lease, resulting in a cost approximately twice the monthly rent of temporary accommodations acceptable to the Browns, an additional cost the Browns will have to incur after the twelve-month anniversary of the Fire.

**Allstate and CRS Seek to Evict the Browns from Their**
**Rental Home During the COVID-19 Pandemic**

89.     On or about May 1, 2019, the Browns, with the approval of Allstate and CRS, executed a lease ("Lease") for a single-family residence ("Rental Home").

90.     The Browns paid the required $6,000 security deposit to CRS, which forwarded the deposit to the landlord for the Rental Home.

91.     Allstate is not a party to the Lease.

92.     On January 13, 2020, three months after Allstate finally concluded its structural claim adjustment process, CRS notified the Browns by email of a "tentative move-out date" of February 29, 2020.

93.     In its January 13, 2020 email, CRS advised the Browns that a "notice to vacate is required. Please be aware that once the notice to vacate is sent, the property will be put back on the rental market…."

94.     Shortly thereafter, the Browns responded, telling CRS they had begun home construction, but given Allstate's unconscionable delays in investigating, adjusting, and paying for the fire loss claim, the Browns would not vacate the Rental Home, as CRS had demanded, by February 29, 2020.

95.     Allstate, through CRS, thereafter "extended" the move-out date to April 22, 2020, the one-year anniversary of the Fire.

96.     In March and April 2020, as the COVID-19 pandemic spread through the United States, shutting down the reconstruction of the Home, Allstate and its agent, CRS, grew increasingly aggressive in their efforts to evict the Browns from the Rental Home in violation of a New York State Executive Order and a judicial decree suspending evictions.

97.     On March 19, 2020, CRS, through Brett Sheppard ("Sheppard"), again contacted the Browns in writing, stating "I wanted to reach out and touch base as we have submitted your required Notice to Vacate to the landlord."

98.     The Browns immediately contacted Sheppard by telephone, telling him the Browns could not vacate the Rental Home, noting that, because of the COVID-19 pandemic, the construction of their replacement home had been halted and all evictions in New York State were suspended by Executive Order.

99.     On or about March 19, 2020, CRS, at Allstate's direction, served the "Notice to Vacate" on the landlord by certified mail, stating falsely the Browns would be vacating the Rental Home on April 22, 2020.

100.    The "Notice to Vacate" demanded the landlord return to CRS the $6,000 security deposit, even though the security deposit was paid by the Browns, not CRS, and CRS therefore had no right to demand its return.

101.    The Browns notified Allstate, CRS, and the landlord that they could not leave the Rental House on April 22, 2020.

102.    In or about May, 2019, Allstate and CRS arranged for a furniture vendor to furnish the Rental House with beds, heavily-used furniture, and some appliances, requiring the Browns to post a $500 security deposit.

103.    On March 26, 2020, despite the restrictions imposed by the COVID-19 pandemic, CRS emailed the Browns, stating:  "Per the direction from Allstate, CRS Temporary Housing will be stepping out as of 4/22/20 and the furniture will have to be collected on this date as well."

**Allstate Attempts to Deflect Blame for its Unreasonably Delayed
Structural Claim Investigation, Adjustment, and Payment**

104.    At or about the time of payment of the structural loss claim, the Browns engaged a modular housing contractor for the construction of a replacement home, who in turn hired a Pennsylvania manufacturing firm to build the modules.

105.    The modular construction process, while more expensive than a traditional "stick-built" house, was selected in an effort to reduce the amount of time necessary to replace the Home.

106.    The Browns recognized that Allstate's delays in investigating, adjusting, and paying the structural loss claim, combined with the Policy's twelve-month cap on ALE, required an expeditious method of construction.

107.    The Browns also arranged for a study by an Allstate-approved remediation company to prepare a plan to abate and remove the asbestos from the Home prior to demolition and to remediate the soot contamination in the garage.

108.    Allstate was not only apprised of these steps, but its adjustors were involved in reviewing the plans for the abatement and remediation and the scope of work for the modular replacement home.

109.    Once Allstate advised in October, 2019 that the long-delayed adjustment process had concluded, the Browns proceeded expeditiously to replace the Home, arranging for appropriate inspections from Town officials and obtaining all required remediation, demolition, and construction permits.

110.    Thereafter, the asbestos remediation was completed, further inspections were obtained, the Home, including its existing foundation, was demolished, all debris was removed, the site was graded, the new modular home was ordered, and work on the foundation was largely completed, with the old foundation removed, a new foundation dug, concrete footings poured, and wall forms constructed.

111.    In March, 2020, the replacement modular home was scheduled to go into production at a factory in Pennsylvania, with the work estimated to take a few weeks, whereupon the modules would be ready to be shipped to the site for assembly.

112.    At the same time, the Browns' contractor, having removed the existing foundation, excavated for the new foundation, poured the new footings, and erected the foundation wall forms, was preparing to pour the concrete foundation onto which the house modules would rest.

113.    These activities were halted when the Governors of the Commonwealth of Pennsylvania and the State of New York issued executive orders halting construction work to slow the spread of the COVID-19 virus.

114.    On April 1, 2020, Allstate, in a letter by its attorneys to the New York State Department of Financial Services, in an effort to deflect blame for Allstate's failings, falsely asserted that "[p]rior to the recent health emergency, [the Browns] made little progress toward rebuilding the insured premises."

115.    Allstate, on a page on its website addressing the COVID-19 pandemic, noted that as "society works together to slow the spread of COVID-19," "Allstate is Here to Help," adding "[w]e remain open and ready to serve you during this time of uncertainty."

116.    Had Allstate not unduly delayed its investigation, adjustment, and payment of the Browns' structural loss claim, resulting in a substantial delay in the reconstruction of the Home, the reconstruction of the Home would have been completed before the effective date of the shutdown orders in Pennsylvania and New York halting construction activity, including the reconstruction of the Home.

117.    Because of the halt in construction, the time to complete the reconstruction of the Home is being expanded, an expansion that would not have been necessary but for Allstate's unnecessary delays in investigating, adjusting, and paying the Browns' structural damage claim, which caused a substantial delay in the commencement of the reconstruction.

118.    The halt in construction due to the COVID-19 pandemic, and the resulting expansion in the amount of time it will take to complete the reconstruction of the Home, will cause the Browns to incur additional living expenses in an amount estimated to exceed $50,000, which would be unnecessary but for Allstate's unnecessary delays in investigating, adjusting, and paying the Browns' structural damage claim.

**First Claim for Relief**
**(Breach of Contract)**

119.    The Browns repeat the foregoing allegations.

120.    The Policy is a contract of insurance between Allstate and the Browns.

121.    On April 20, 2019, the Policy provided insurance coverage to the Browns for property damage to the Home and the loss of contents arising from the Fire.

122.    The Browns fully performed their obligations under the Policy, paying all required premiums, providing all required notices timely, and cooperating with Allstate and its investigators in their investigation into the cause and origin of the Fire.

123.    Allstate materially breached its obligations under the Policy by unduly delaying its investigation, adjustment, and payment of the Browns' structural loss claim, thereby delaying the reconstruction of the Home and causing the Browns to incur unnecessary expenses for which Allstate has refused to reimburse the Browns, including unnecessary additional living expenses in an amount estimated to exceed $50,000 and unnecessary interior demolition work in an amount exceeding $40,000.

124.   Allstate's material breach of the Policy is continuing.

125.   By reason of the foregoing, the Browns the Browns are entitled to a money judgment in an amount to be determined at trial, but estimated to exceed $75,000, exclusive of interest and costs.

## Second Claim for Relief
### (Promissory Estoppel)

126.   The Browns repeat the foregoing allegations.

127.   Allstate, through its employees and agents, promised, represented and assured the Browns that the period for ALE payments would be enlarged due to Allstate's failure to timely and diligently investigate, adjust, and pay the Browns' structural damage claim.

128.   In making those promises, representations, and assurances, Allstate knew or should have known the Browns would rely on those promises, representations, and assurances.

129.   In reasonable reliance on Allstate's promises, representations, and assurances, the Browns, to their detriment, did not investigate and arrange for alternative living arrangements upon the expiration of the twelve-month cap stated in the Policy.

130.   As a direct and proximate result of Allstate's failure and refusal to adhere to its promise, representation, and assurance that the period for ALE payments would be enlarged due to Allstate's failure to timely and diligently investigate, adjust, and pay the Browns' structural damage claim, the Browns have sustained, and will continue to sustain, damages.

131.   By reason of the foregoing, the Browns are entitled to a money judgment in an amount to be determined at the trial of this action but estimated to exceed $75,000, exclusive of interest and costs.

**Third Claim for Relief**
**(Breach of Contract:  Implied Covenant of Good Faith and Fair Dealing)**

132.    The Browns repeat the foregoing allegations.

133.    There is a covenant of good faith and fair dealing implied in all contracts entered into and governed by the laws of the State of New York.

134.    Allstate breached the covenant of good faith and fair dealing implied in the Policy by, among other things, unduly delaying its investigation, adjustment, and payment of the Browns' structural loss claim, knowing that the Browns' ALE coverage was limited in time, and by requiring the Browns to incur unnecessary expenses for Allstate's investigation, which expenses were wrongly characterized as a Policy benefit and reduced the contents coverage available to the Browns under the Policy.

135.    Consequential damages for bad faith breach of the Policy were reasonably contemplated by Allstate at the time it issued and entered into the Policy.

136.    By reason of Allstate's breach of the covenant of good faith and fair dealing implied in the Policy, the Browns have been and continue to be damaged in an amount to be determined at trial, but estimated to exceed $75,000, exclusive of interest and costs.

**Fourth Claim for Relief**
**(Deceptive Practices: General Business Law §349)**

137.    The Browns repeat the foregoing allegations.

138.    Under New York General Business Law ("GBL") § 349(a), "deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state" are unlawful.

139.    Allstate, upon information and belief, makes a practice of purposely delaying the adjustment of claims without regard to the validity of the claims.

140.    Allstate, as an insurer that makes a practice of delaying and denying claims under standard insurance policies issued to consumers, is engaged in consumer-oriented conduct under GBL § 349.

141.    Allstate engaged in a consumer-oriented deceptive practice of characterizing its investigation costs, including the cost of unnecessary interior demolition and debris removal, to support an untenable reparability position, as part of the "benefit" paid under the Policy when these investigation costs are undertaken to serve Allstate's financial interests rather than provide a benefit to the Browns.

142.    Allstate engaged in a consumer-oriented deceptive practice of delaying its adjustment process, knowing the Browns' ALE coverage was limited in time.

143.    Allstate engaged in a consumer-orientated deceptive practice by representing and committing to the Browns that it would enlarge the ALE coverage to address Allstate's delays in investigating, adjusting, and paying the structural damage claim and then retracting and denying that representation and commitment.

144.    Allstate engaged in a consumer-oriented deceptive practice of selling insurance policies containing a twelve-month ALE limitation, knowing that such provision is, in the case of catastrophic damage requiring extensive repair or replacement of a home, commercially unreasonable.

145.    Allstate and CRS engaged in a consumer-oriented deceptive practice by causing the issuance of the "Notice to Vacate" in an effort to effect the eviction of the Browns without legal process.

146.    Allstate and CRS engaged in a consumer-oriented deceptive practice by serving the "Notice to Vacate" advising the landlord that the Browns would vacate the rental home when they had no right to do so.

147.    Allstate and CRS engaged in a consumer-oriented deceptive practice by using the "Notice to Vacate" to attempt to obtain the Brown's security deposit, moneys to which it had no legal right or claim.

148.    The Browns, as a result of the actions of Allstate and CRS, have suffered emotional distress.

149.    By reason of the deceptive practices of Allstate and CRS, the Browns have been and continue to be damaged in an amount to be determined at trial, but estimated to exceed $75,000, exclusive of interest, treble damages, attorneys' fees, and costs.

**WHEREFORE**, Plaintiffs demand judgment as follows:

On the First Claim for Relief, a money judgment against Allstate in an amount to be determined at trial, but estimated to exceed $75,000, exclusive of interest and costs;

On the Second Claim for Relief, a money judgment against Allstate in an amount to be determined at trial, but estimated to exceed $75,000, exclusive of interest and costs;

On the Third Claim for Relief, a money judgment against Allstate in an amount to be determined at trial, but estimated to exceed $75,000, exclusive of interest and costs;

On the Fourth Claim for Relief, (i) a money judgment against Allstate and CRS in an amount to be determined at trial, but estimated to exceed $75,000, exclusive of interest and costs, with treble damages, attorneys' fees, and such other and further relief as provided for in General Business Law § 349, and (ii) a preliminary and permanent injunction enjoining Allstate and CRS

from continuing their unlawful and deceptive practices, as provided for in General Business Law § 349(h); and

The costs of this action, statutory interest, declaratory relief, and such other and further relief as may be just and proper.

Dated: Uniondale, New York
      April 20, 2020

                    FARRELL FRITZ, P.C.

By:    *John P. McEntee*
                John P. McEntee
                *Attorneys for Plaintiffs*
                400 RXR Plaza
                Uniondale, NY 11556-3826
                (516) 227-0700

FF\9353235.4